

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00241-CV

_____

TOWN OF WESTLAKE, TEXAS, Appellant

V.

CITY OF SOUTHLAKE, TEXAS, Appellee

---

On Appeal from County Court at Law No. 1
Tarrant County, Texas
Trial Court No. 2020-007041-1

---

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I.  Introduction

In two issues, Appellant the Town of Westlake challenges the trial court's order denying Westlake's plea to the jurisdiction in which it asserted that the trial court lacked subject-matter jurisdiction over a condemnation action filed against Westlake by Appellee the City of Southlake.  Southlake not only responds to Westlake's arguments on appeal but also has moved to dismiss this appeal.  For the reasons we detail below, we deny Southlake's motion to dismiss.  But we also overrule the two issues raised by Westlake.  We reject Westlake's argument in its first issue that the statute that Southlake relied on for its power to condemn lacks a clear and unambiguous waiver of Westlake's governmental immunity.  We also reject the two subparts of Westlake's second issue that the trial court erred by rejecting Westlake's jurisdictional challenges that (1) Southlake cannot establish that it is taking property for a public use and (2) no jurisdiction exists over Southlake's condemnation action because it is an attempt to usurp Westlake's authority to control the highways and streets within its town limits.  This opinion will not definitively answer either of these issues.  Instead, we read the trial court's order to conclude that Westlake failed to conclusively establish the basis for its jurisdictional plea based on a lack of public use and that resolution of the issue raised in the plea on the question of Westlake's control over highways and streets within its boundaries was premature.  Neither ruling was error.  Accordingly, we affirm the trial court's order.

## II. Factual and Procedural Background

At its core, the underlying controversy is a clash between Southlake's claimed right to condemn and Westlake's claimed right to control a tract covering a sum total of 1,414 square *feet*. Throughout this opinion, we will describe this tract as the Access Tract.

The controversy revolves around a proposed residential development (Residential Development) in Southlake. The Residential Development sits on a eighteen-acre tract of thirteen lots with its western boundary abutting the western city limit of Southlake. Immediately adjoining the western city limit of Southlake is the eastern town limit of Westlake. Immediately inside Westlake's eastern town limit is a right of way that abuts the lanes of Farm-to-Market Road 1938 (FM 1938). That right of way is owned by Westlake. But the roadway of FM 1938 is owned by the State of Texas. The construction of the present configuration of FM 1938 was a cooperative effort of Southlake, Westlake, Keller, and Tarrant County.

To aid in visualizing the position of the Residential Development, the boundaries of the municipalities, and the location of FM 1938, Westlake's opening brief contains the following aerial photograph:



Westlake's brief describes the lines superimposed on the picture as follows: "In the above aerial, the green line illustrates the property lines of the 13-Lot Development[,] and the red line identifies the boundary between Westlake and Southlake. The [Access Tract] is situated between the 13-Lot Development in Southlake and FM-1938 (aka Davis Blvd.) in Westlake."[1]  [Record citations omitted.]

---

[1]If the photo is reproduced in black and white, the Residential Development is roughly the upper left quadrant, and the boundary between Westlake and Southlake runs parallel to Davis Boulevard to Davis Boulevard's immediate right and abuts the west (left) boundary of the Residential Development. The dispute is over Southlake's inability to access Davis Boulevard over the sliver of land between Davis Boulevard and the Westlake–Southlake boundary.

The only existing access to the Residential Development is a road intersecting its southern boundary. For several years, the developer of the tract has sought access to FM 1938 through Westlake's right of way. Westlake has rebuffed those efforts. Westlake has taken the position that the access sought would undermine Southlake's Master Mobility Plan that limits access to FM 1938 and would potentially damage a wall that Westlake contends supports the roadway of FM 1938. Indeed, Westlake has recently amended its Access Management Ordinance to limit the number of access points to roadways such as FM 1938.

Westlake claims that when Southlake approved the Residential Development, Southlake recognized that the tract had only the limited access created by the road intersecting it from the south. In essence, Westlake claims that the present condemnation action brought by Southlake is an attempt by Southlake to use its powers of condemnation to gain access to FM 1938 that the developer has not been able to negotiate.

And there is no question that the property taken by Southlake would open a corridor to FM 1938. The condemnation petition that Southlake filed against Westlake contains the following paragraphs that describe the property to be acquired and the purpose to which it will be put:

# V.

## PROPERTY TO BE ACQUIRED

[Southlake] seeks to acquire and condemn the following property in fee simple as permanent Right-of-Way:

**<u>Permanent Right-of-Way:</u>**

Being an approximate 1,414 square foot tract of property from the F.M. 1938 Corridor in Westlake, Tarrant County, Texas . . . (the "Property").

# VI.

## PUBLIC USE

The public use and purpose for acquiring fee simple title in and to an approximate 1,414 square foot permanent Right-of-Way from the F.M. 1938 Corridor is for the purpose of constructing certain municipal improvements, specifically roadway improvements, in order to provide public access to Davis Boulevard (F.M. 1938) and/or other public use or public purposes permitted by law, in order to serve existing and future developments in the City of Southlake, Texas.

The Access Tract that Southlake sought to take is represented by the bolded

trapezoid in the following image:



EXHIBIT "B"
1,414 SQ.FT. - RIGHT-OF-WAY
SITUATED IN THE WILLIAM H. MARTIN SURVEY,
ABSTRACT NO. 1068, TOWN OF WESTLAKE,
TARRANT COUNTY, TEXAS

Once Southlake filed its condemnation petition, the trial court followed the process mandated by the Property Code and appointed commissioners "to assess the damages of the owner of the property being condemned." *See* Tex. Prop. Code Ann. § 21.014(a). The commissioners conducted the hearing mandated by the Property Code for a condemnation proceeding. *See id.* § 21.015. The commissioners then entered an order that awarded Westlake damages of $22,700 for Southlake's taking of the Access Tract.

7

The Property Code specifies that an objection to the commissioners' findings "must be filed on or before the first Monday following the 20th day after the day the commissioners file their findings with the court." *Id.* § 21.018(a). Here, however, a week before the commissioners' findings were filed, Westlake challenged them by filing a "Motion to Dismiss, And Subject Thereto, Motion in Opposition of Writ of Possession, Application for Temporary Restraining Order, Application for Temporary Injunction, and Objections to Commissioners' Report and Award." In essence, this motion asserted that Southlake's condemnation action was an attempt to wrest away Westlake's right to control the streets and highways within its town limits. The motion also contended that the doctrine of paramount importance prevented the taking because "condemnation is not authorized to take property that has already been dedicated to a public use when such condemnation would practically destroy the use to which it has been devoted." The trial court conducted a non-evidentiary hearing on Westlake's motion to dismiss and denied it.

Westlake then launched a second attack on the condemnation by filing a plea to the jurisdiction. This plea claimed that there was a "want of jurisdiction" to support Southlake's condemnation action because Westlake was protected by governmental immunity from such an action. The plea to the jurisdiction argued that Southlake's condemnation attempted to usurp a power that the legislature had given to Westlake to control the streets and highways within its town limits. The plea's preface stated its

8

grounds as being the same argument about control of streets and highways that was raised in the motion to dismiss:

> In this condemnation suit[,] Southlake seeks the acquisition of real property owned by Westlake where Southlake's intended use of that property is prohibited by law. Southlake's ability to exercise the power of eminent domain is exclusively limited to the condemnation of property for a "public use." Given that Southlake's proposed use of the subject property is illegal, there can be no public use. Westlake is both the landowner of the property [that] Southlake seeks to acquire and a governmental entity. As a governmental entity, Westlake enjoys governmental immunity from suit, which defeats a trial court's jurisdiction. Although a condemnation claim under Local Government Code Section 251.001 may serve as a general exception to the Town's governmental immunity, Westlake's immunity is only waived if Southlake pleads a facially valid condemnation claim. Southlake's stated public purpose for the attempted condemnation of Westlake's property is "roadway improvements" inside the Town Limits of Westlake. However, Southlake has no legal authority to build a roadway inside the Town Limits of Westlake because [a] state statute vests Westlake [with] *exclusive control* over roadways within its boundaries. Westlake has not allowed and has no intention of allowing Southlake's proposed roadway to be constructed within its Town Limits. Southlake mistakenly conflates its potential ownership of Westlake property with its ability to regulate the use of that property. Southlake has no authority to unilaterally annex property within the Town Limits of Westlake. It would be a violation of state law and the Town of Westlake Ordinance for Southlake to use Westlake's property as it intends. Therefore[,] there can be no public use of the property [that] Southlake seeks to condemn. As such, Southlake has not and cannot plead a valid condemnation claim, and Westlake's immunity is not waived.

The trial court conducted a non-evidentiary hearing on Westlake's plea to the jurisdiction and denied it. The trial court also accepted Southlake's argument that Westlake's plea should be characterized as a motion for summary judgment. Thus, the order contained the following provision: "It further appears to the [c]ourt that

9

Westlake's Plea to the Jurisdiction was incorrectly named and that, pursuant to the provisions of Rule 71, Texas Rules of Civil Procedure, such pleading should be treated as a 'Motion Seeking Summary Judgment Denying Southlake's Right to Take.'"

Westlake filed an interlocutory appeal of the trial court's second order relying on the provision of the Civil Practice and Remedies Code that permits an appeal from an interlocutory order that denies a plea to the jurisdiction by a governmental unit. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8). Then, Southlake filed a motion to dismiss the appeal.

## III. Why We Deny Southlake's Motion to Dismiss Westlake's Appeal

### A. Overview

We must first address Southlake's motion to dismiss Westlake's appeal. The motion has two bases: (1) Westlake never invoked the jurisdiction of the trial court because it filed a premature objection to the commissioners' award; and (2) Westlake's appeal was untimely because it should have appealed the trial court's denial of its motion to dismiss and because the appeal of its plea was an impermissible attempt to restart the appellate timetable. We deny Southlake's motion to dismiss the appeal. First, the trial court's jurisdiction attached once the commissioners' findings were filed, even if Westlake jumped the gun in filing its objections to those findings before they were filed with the trial court. Second, there was a sufficient procedural

10

distinction between Westlake's motion to dismiss and its plea to the jurisdiction to conclude that the plea was more than a motion to reconsider the denial of Westlake's motion to dismiss. Thus, the appellate timetable began to run when the trial court signed the second order.[2]

**B.** **Why we overrule Southlake's first ground urging us to dismiss Westlake's appeal**

The condemnation procedure in the Property Code establishes that the first step in a condemnation proceeding is the filing of a condemnation petition, which triggers the appointment of three commissioners who determine just compensation and then file their award with the trial court. *See* Tex. Prop. Code Ann. §§ 21.012, .014(a). As noted above, the Property Code provides the following procedure should a party object to the award:

> A party to a condemnation proceeding may object to the findings of the special commissioners by filing a written statement of the objections and their grounds with the court that has jurisdiction of the proceeding. The statement must be filed on or before the first Monday following the 20th day after the day the commissioners file their findings with the court.

*Id.* § 21.018(a).

The filing of an objection signals a change in status of the proceeding from an administrative one to a judicial one. As the Texas Supreme Court has explained,

> [C]ondemnation proceedings have two parts. The first part, involving the commissioners, we have characterized as administrative. It is

---

[2]For an accelerated appeal of the type that Westlake filed, "the notice of appeal must be filed within 20 days after the judgment or order is signed." *See* Tex. R. App. P. 26.1(b).

11

essentially an official, compulsory mediation of the value dispute with the goal of avoiding a trial. We have said that trial courts lack jurisdiction to interfere with proceedings pending before the commissioners. The second part of condemnation proceedings, following a proper objection to the commissioners' award, we have deemed judicial. The commissioners' proceedings are ignored[,] and the court has jurisdiction to proceed as in any other case.

*In re Lazy W Dist. No. 1*, 493 S.W.3d 538, 542–43 (Tex. 2016) (orig. proceeding) (footnotes omitted).

Southlake's first argument in its motion to dismiss this appeal turns not on the claim that a party failed to meet the deadline by filing an objection too late but instead that the objecting party filed its objection a week too early. But as the language we have quoted from the Property Code section setting the deadline demonstrates, that section does not address the consequences of filing an objection too early. *See* Tex. Prop. Code Ann. § 21.018(a). We agree with the federal court opinion we rely on to reject Southlake's argument that the consequences of anticipating a deadline in the transition of an administrative action to a judicial one and missing the deadline to object once the transition has occurred are horses of a different color. *See Mackey v. Children's Med. Ctr. of Dall.*, No. 3:05-CV-043-L, 2006 WL 2713788, at *6–8 (N.D. Tex. 2006) (mem. op. & order).

The federal court in *Mackey* dealt with an action under the Texas Commission on Human Rights Act (TCHRA) in which a plaintiff jumped the procedural gun by "not wait[ing] the statutory period of 180 days to allow the [Civil Rights Division of the Texas Workforce Commission] to dismiss or resolve the complaint before filing

suit" and by filing suit before "receiv[ing] a notice of right to file a civil action." *Id.* at

*6. The defendant argued that the premature filing deprived the trial court of subject-

matter jurisdiction. *Id. Mackey* surveyed several Texas cases to explain why it rejected

such a "gotcha" argument:

> After a careful analysis of Texas cases where employees have prematurely filed suit under statutory exhaustion requirements equally or more stringent tha[n] those involved herein, the court rejects Defendant's argument that this court is without subject[-]matter jurisdiction to entertain Plaintiff's TCHRA claims. In a *per curiam* opinion, the Texas Supreme Court, confronted with a nearly identical situation of premature filing in the face of the arguably more stringent statutory exhaustion requirements of the Texas Whistleblower Act, held that premature filing is not incurable, and jurisdiction vests or attaches once the required time has elapsed. *See Univ[.] of Tex[.] Med[.] Branch at Galveston v. Barrett*, 159 S.W.3d 631, 632 (Tex. 2005) (*per curiam*) (disapproving of cases holding that a trial court lacks jurisdiction of an action filed during the 60-day period provided by [S]ection 554.004(d) of the Texas Whistleblower Act, and holding that where public employee prematurely files suit under Texas Whistleblower Act before expiration of 60-day period for public employer to complete its grievance or appeal procedures, the suit should be abated until end of 60-day period rather than dismissed, provided that the procedures have been timely initiated and can continue for the required 60 days or until a final decision is rendered, whichever occurs first). In so ruling, the Texas Supreme [C]ourt reaffirmed years of case law under a variety of statutes allowing after-acquired jurisdiction once the required time has elapsed. *Id.* (and cases cited therein)[;] [*s*]*ee also Tex[.] [Emp.] Comm'n v. Stewart Oil Co.*, 267 S.W.2d 137 (Tex. 1954) (premature filing does not destroy jurisdiction); *Bolduc v. Nat[']l Union Fire Ins. Co.*, 839 S.W.2d 152 (Tex. App.—Houston [1st Dist.] 1992, no writ) (same); *Cole v. Tex[.] [Emp.] Comm'n*, 563 S.W.2d 363 (Tex. . . . App.—Fort Worth 1978, writ dism'd) (same); *Crosland v. Tex[.] [Emp.] Comm'n*, 550 S.W.2d 314 (Tex. . . . App.—Dallas 1977, writ ref'd n.r.e.) (same); *Tex[.] [Emp.] Comm'n v. Hartzheim*, 549 S.W.2d 770 (Tex. . . . App.—San Antonio 1977, no writ) (same). *Compare with Hines v. Hash*, 843 S.W.2d 464, 468–69 (Tex. 199[2]) (failure to comply with Texas Deceptive Trade Practices Act's requirement that a consumer shall give written notice to a defendant of his complaint as a prerequisite to

13

filing suit seeking damages results in abatement until condition met, not dismissal).

*Id.* at *7.

Though neither Westlake nor Southlake reference the concept, what *Mackey* refers to as after-acquired jurisdiction establishes that once the commissioners' findings were filed, jurisdiction attached to Westlake's prematurely filed objection. To argue that the premature filing is a "gotcha" that deprives the court of jurisdiction when the words of Section 21.018(a) do not compel this result elevates form over substance.[3] We see no reason—and Southlake offers no argument explaining—why jurisdiction should not have vested in the trial court over a prematurely filed objection once the commissioners' findings were filed.

Also, as Westlake notes in its response to Southlake's motion to dismiss the appeal, a landowner may try to prevent the condemnor from exercising its right to take possession of the property once the award has been filed and the damages assessed by the commissioners has been deposited:

> Additionally, the Texas Property Code permits a condemnor to take possession of the property when the award is filed and a deposit is paid into the registry of the trial court. *See* Tex. Prop[.] Code [Ann.] § 21.021(a). As such, a landowner challenging a condemnor's right to take would be motivated to file a statement of objections before the award is filed and before the condemnor has the opportunity to take [possession] of the property. Under Southlake's interpretation of the statute, a landowner must risk damage to property because he could not

---

[3]Rule 27.1(b) of the Texas Rules of Appellate Procedure is an example of a rule setting out the consequences of premature filings. *See* Tex. R. App. P. 27.1(b).

14

file a preemptive pleading – even in instances of gross misuse of eminent domain.

It appears that Westlake acted before the award was filed in an effort to forestall Southlake from taking possession of the Access Tract. Westlake's motion to dismiss stated that "[t]he purpose of this pleading is to stop Southlake's invasion of Westlake before irreparable harm is done." In dealing with an analogous situation, the Texas Supreme Court has held that in a condemnation fight between two governmental entities, a trial court has jurisdiction to hear a plea to the jurisdiction before a condemnation action transitions from an administrative action to a judicial action. *See Lazy W Dist. No. 1*, 493 S.W.3d at 543–45. Though the principle relied on by the supreme court in *Lazy W* was that courts always have jurisdiction to decide their own jurisdiction, the supreme court did not suggest that Property Code Section 21.018 was a bar because it set a deadline *before* which an objection could not be filed. *Id.* at 544.

We deny Southlake's first ground for dismissing the appeal.

## C.    Why we overrule Southlake's second ground urging us to dismiss Westlake's appeal

Southlake's second basis for dismissal is that Westlake did not appeal the order denying its motion to dismiss and that its appeal of the order denying its plea to the jurisdiction is a second bite at the apple. Westlake responds that its motion to dismiss did not raise a jurisdictional argument and thus, from the perspective of a challenge to the trial court's jurisdiction, the plea to the jurisdiction was the only bite it ever took. Southlake's argument ignores that even if Westlake's plea were a second bite,

15

Westlake had a right to an interlocutory appeal as long as the second bite it took was on a different side of the apple, that is, by basing the second motion on grounds different than the first.

Westlake's right to an interlocutory appeal is governed by Section 51.014(a)(8) of the Civil Practice and Remedies Code, which provides for an appeal if the trial court "grants or denies a plea to the jurisdiction by a governmental unit." *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8). The Texas Supreme Court has set the boundaries of when a party may file an interlocutory appeal from a second plea to the jurisdiction. That boundary in essence asks whether the second plea to the jurisdiction is simply a motion to reconsider because it makes new arguments only to support a previously asserted ground. *See City of Magnolia 4A Econ. Dev. Corp. v. Smedley*, 533 S.W.3d 297, 301 (Tex. 2017) (explaining that "[u]nder [*Estate of*] *Jones*, the touchstone of our analysis [is] whether the later plea to the jurisdiction [is] a new and distinct motion or a mere motion to reconsider"); *City of Hous. v. Estate of Jones*, 388 S.W.3d 663, 666–67 (Tex. 2012) (holding that an appellate court does not have interlocutory jurisdiction over an amended plea to the jurisdiction that was substantively a motion to reconsider the original plea to the jurisdiction because the amended plea did not assert a new immunity ground).

One of our sister courts of appeals has liberally applied the supreme court's principles to determine when the appeal of a second order is permitted. *See Vinson v. Tucker*, Nos. 13-16-00639-CV, 13-16-00642-CV, 2018 WL 2170007, at *3 (Tex.

16

App.—Corpus Christi–Edinburg May 10, 2018, no pet.) (mem. op. on reh'g). The Corpus Christi–Edinburg Court of Appeals allowed an appeal from a second motion to dismiss that raised immunity because the second motion had additional evidence attached and raised a new legal argument, even though the second motion raised the same general argument as the first motion to dismiss:

> In this case, [appellants'] amended and second amended motions to dismiss made the same general argument as their original motions—i.e., that the trial court was required to dismiss for want of jurisdiction under [S]ection 101.106(f) of the [Texas Tort Claims Act]. However, the amended motions also included three additional pieces of evidence [that] were not attached to the original motions, and they also included a new section addressing whether the actions complained of by [appellee] were *ultra vires* such that governmental immunity would not apply. In light of the ruling in *Smedley*, we conclude that the second amended motions were sufficiently different in substance from the first motions so as to be independently appealable. The second amended motions were not mere motions for reconsideration but were distinct motions meriting their own twenty-day interlocutory appeal period. *See* [*Smedley*, 533 S.W.3d at 302.] Therefore, we have jurisdiction over the interlocutory appeals. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(5).

*Id.* at *3.[4]

Here, we conclude that Westlake's plea to the jurisdiction is more than just a motion to reconsider, though barely so. Southlake contends that Westlake's motion to dismiss and its plea to the jurisdiction raise the same argument but just in documents bearing different titles. Southlake correctly argues that no matter what the

---

[4]The interlocutory appeal that *Vinson* dealt with is one that "denies a motion for summary judgment that is based on an assertion of immunity by an individual who is an officer or employee of the state or a political subdivision of the state[.]" *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(5).

17

title of a pleading, if it raises a jurisdictional issue, it is considered a plea to the jurisdiction. *Estate of Jones*, 388 S.W.3d at 666 ("We have construed 'plea to the jurisdiction' in Section 51.014(a)(8) to refer to a substantive claim of immunity rather than to a particular type of procedural vehicle."). Southlake argues that Westlake's motion to dismiss "was based on the argument that Southlake cannot declare a public use for the construction of a roadway within Westlake because Transportation Code Section 311.002 gives Westlake exclusive control over the roadways within its boundaries." According to Southlake, Westlake's plea to the jurisdiction simply parroted this argument.

> Westlake responds,
>
> In Westlake's Plea to the Jurisdiction, the very first line in Westlake's argument is as follows: "[t]his Court does not have subject[-]matter jurisdiction over the condemnation claim asserted against Westlake[,] and Southlake's suit should be dismissed because Westlake's governmental immunity has not been waived." The Motion to Dismiss is completely devoid of any such argument. The two pleadings simply did not assert the same legal principles as Southlake falsely claims. [Record reference omitted.]

But the legal theories underlying the motion to dismiss and the plea to the jurisdiction are the same—a fact that Westlake skirts—and Westlake does not argue that it supported those arguments with different proof in the plea to the jurisdiction than it did in the motion to dismiss.

Thus, the question we confront is whether the fact that the plea to the jurisdiction switched from the merits-based argument in the motion to dismiss to a

jurisdiction-based argument is a sufficient procedural distinction to save Westlake's appeal. The Texas Supreme Court in *Smedley* concluded that there was a sufficient difference between a motion to dismiss and a motion for summary judgment because the two pleadings were different in their substantive and procedural natures. 533 S.W.3d at 302. The Corpus Christi–Edinburg Court permitted the appeal of a second motion based in part because a second motion raised a new legal argument. *See* *Vinson*, 2018 WL 2170007, at *3. Here, Westlake's plea to the jurisdiction was the first document predicated on a lack of jurisdiction. We conclude that because the plea to the jurisdiction was the first occasion when the jurisdictional argument was presented to the trial court, the denial of the plea was the first event to trigger Westlake's right to appeal under Section 51.014(a)(8) of the Civil Practice and Remedies Code. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8). Put another way, Westlake's motion to dismiss did not contest the trial court's jurisdiction to rule on the merits in its favor, and Westlake's plea to the jurisdiction contested the trial court's jurisdiction to grant relief in Southlake's favor. Thus, Westlake's appeal was timely.

We deny Southlake's second ground for dismissing the appeal.

## IV. Our Analysis of the Merits of Westlake's Appeal

### A. Overview

The arguments that Westlake makes on appeal and our reasons for rejecting them are as follows:

- In its first issue, Westlake claims that there is no clear and unambiguous waiver of a condemnee's governmental immunity in Section 251.001 of the Local Government Code that permits a municipality to sue another municipality to condemn public land. We reject this argument because it fails to acknowledge the import of the language of the statute—which expressly authorizes eminent domain to acquire property whether public or private and regardless of "whether [the property is] located inside or outside the municipality," and fails to recognize the mechanisms in Texas law that avoid the parade of horribles that Westlake claims will occur if we conclude that Section 251.001 waives a public-entity condemnee's immunity. *See* Tex. Loc. Gov't Code Ann. § 251.001.

- Westlake claims as part of its second issue that the trial court lacked jurisdiction because Southlake admitted that its taking was not for a public use. Westlake ignores the standards that guide the public-use determination and relies on evidence that is far from conclusive to prove its claim that the taking had no public use. At bottom, we express no

20

opinion on how this question will ultimately be resolved but conclude only that the trial court did not err by overruling Westlake's plea to the jurisdiction after it construed that plea as a motion for summary judgment that it could not grant due to unresolved factual issues.

- We take a similar restrained approach to Westlake's other argument under its second issue—that the trial court had no jurisdiction to hear Southlake's condemnation claims because Southlake is attempting to interfere with Westlake's exclusive right to control streets and highways within its town limits. At this point, the record is undeveloped regarding how the fact that the State owns the roadway of FM 1938 impacts this issue. The trial court was within its discretion to deny Westlake's plea to the jurisdiction until this issue is more fully developed.

**B. Why we conclude that the language of Section 251.001 waives Westlake's governmental immunity to the extent that it may be joined as a defendant in Southlake's condemnation action**

In its first issue, Westlake argues that Section 251.001 of the Local Government Code—the statute that Southlake claims empowered it to condemn land in Westlake—did not clearly and unambiguously waive Westlake's governmental immunity. We disagree. Westlake's primary authority for the argument is a statement in a Texas Supreme Court opinion raising a hypothetical in dicta. However, the actual holding of the case supports a conclusion that Section 251.001 does waive the immunity of a public-entity condemnee. Further, the implication of Westlake's

21

argument is that when a municipality seeks to condemn public property and exercise the right that the statute provides, a municipality cannot exercise that right unless a search of the statute books uncovers a waiver of the condemnee's immunity. That argument seems perverse when other mechanisms act as a check on a municipality's power to condemn public property and when those issues are properly litigated not as part of a jurisdictional determination but as part of a condemnation proceeding on its merits by a court of competent jurisdiction.[5]

Initially, we note that Westlake is making a new argument on appeal. As we read Westlake's plea to the jurisdiction and its arguments to the trial court, Westlake did not claim that Section 251.001 lacked a waiver of its governmental immunity because the statute does not include an explicit waiver of that immunity. Specifically, Westlake's plea stated, "*Although a condemnation claim under Local Government Code Section 251.001 may serve as a general exception to the Town's governmental immunity*, Westlake's immunity is only waived if Southlake pleads a facially valid condemnation claim." [Emphasis added.] Nonetheless, we are obliged to address the argument. *See Rusk*

_____

[5]To be clear, our holding in this section of the opinion is only that Section 251.001 permits Southlake to hail Westlake into court. This holding does not resolve or suggest a resolution of the other questions possibly raised by Southlake's condemnation proceeding or the other issues raised by Westlake. We express no opinion about the power of one municipality to take property of another in a way that may alter the boundaries of the other municipality. Nor does the holding in this section of the opinion suggest answers to the questions that Westlake attempts to raise in this appeal regarding whether Southlake had a public use for its taking, whether Southlake usurped Westlake's power to control its streets and highways, or whether either of these issues raises a jurisdictional question.

*State Hosp. v. Black*, 392 S.W.3d 88, 94–97 (Tex. 2012) (holding that defendants may bring—and courts must address—immunity-based jurisdictional challenges that are raised for the first time on appeal, even in the context of an interlocutory appeal); *see also Dall. Metrocare Servs. v. Juarez*, 420 S.W.3d 39, 41 (Tex. 2013) ("Under *Rusk*, an appellate court must consider all of a defendant's immunity arguments, whether the governmental entity raised other jurisdictional arguments in the trial court or none at all.").

Our analysis is guided by the following principles, which are either indisputably the legal principles applicable to this controversy or the legal principles to which no dispute is raised in this appeal:

- As a subdivision of the State, Westlake is protected by governmental immunity. *See City of Watauga v. Gordon*, 434 S.W.3d 586, 589 (Tex. 2014).

- "Governmental immunity generally protects municipalities and other state subdivisions from suit unless the immunity has been waived by the constitution or state law," and a governmental unit's immunity deprives a trial court of subject-matter jurisdiction. *Univ. of Tex. M.D. Anderson Cancer Ctr. v. McKenzie*, 578 S.W.3d 506, 512 (Tex. 2019) (quoting *City of Watauga*, 434 S.W.3d at 589).

- Governmental immunity protects a municipality from condemnation suits. The Corpus Christi–Edinburg Court of Appeals recently performed an in-depth analysis of this question and concluded that governmental immunity does exist in condemnation suits. *See Hidalgo Cnty. Water Improvement Dist. No. 3 v. Hidalgo Cnty. Water Irrigation Dist. No. 1*, 627 S.W.3d 529, 535–39 (Tex. App.—Corpus Christi–Edinburg 2021, pet. filed). Westlake cites *Hidalgo* for the proposition that governmental immunity applies to condemnation suits, and Southlake does not challenge its holding.

- Governmental immunity, like sovereign immunity, may be properly asserted in a plea to the jurisdiction. *See Ryder Integrated Logistics, Inc. v. Fayette Cnty.*, 453 S.W.3d 922, 927 (Tex. 2015); *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).[6]

- The legislature may waive a municipality's governmental immunity. *See Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853 (Tex. 2002).

---

[6]"'Sovereign immunity' protects the State and state-level governmental entities, while 'governmental immunity' protects political subdivisions of the State such as counties, cities, and districts . . . ." *Lubbock Cnty. Water Control & Improvement Dist. v. Church & Akin, L.L.C.*, 442 S.W.3d 297, 300 n.4 (Tex. 2014).

- The Government Code dictates that "a statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language." Tex. Gov't Code Ann. § 311.034.[7]

In deciding whether a clear and unambiguous waiver of immunity exists, we may rely on language that sufficiently implies the waiver, even if the waiver is not explicitly stated. *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 697 (Tex. 2003). The Texas Supreme Court itemized a number of factors that courts should consider in deciding whether a waiver is sufficiently clear and unambiguous:

(1) consider "whether the statutory provisions, even if not a model of clarity, waive immunity without doubt[";]

(2) resolve any "ambiguity as to waiver . . . in favor of retaining immunity[";]

(3) generally find waiver "if the Legislature requires that the [governmental] entity be joined in a lawsuit even though the entity would otherwise be immune from suit[";]

(4) consider whether the legislature "provided an objective limitation on the governmental entity's potential liability"; and

(5) consider "whether the statutory provisions would serve any purpose absent a waiver of immunity."

*Hillman v. Nueces Cnty.*, 579 S.W.3d 354, 360 (Tex. 2019).

---

[7]Whether a statute waives immunity by clear and unambiguous language presents a question of statutory construction that we review de novo. *Qatar Found. for Educ., Science and Cmty. Dev. v. Zachor Legal Inst.*, 627 S.W.3d 674, 678 (Tex. App.—Austin 2021, pet filed). Further, because no factual dispute impacts the issue and it turns on a question of statutory construction, we also review de novo the overall question whether the trial court properly denied Westlake's plea because Section 251.001 waives a municipality's governmental immunity. *Id.*

In addition to these general factors, we also have more targeted guidance from the supreme court when it dealt with a statute that waived immunity for a taking of public property. *See Oncor Elec. Delivery Co. v. Dall. Area Rapid Transit*, 369 S.W.3d 845, 849 (Tex. 2012). *Oncor* dealt with an electric utility that was seeking to condemn the property of a public entity. *Id.* at 847. The supreme court analyzed a Utility Code provision that gave an electric company a statutory power of condemnation found in another section of the Utility Code by stating that "the rights extended to an electric corporation under [the provision providing the right to condemn] include all public land, except land owned by the state, on which the commission has approved the construction of the line." Tex. Util. Code Ann. § 37.053(d).

The supreme court concluded that Section 37.053(d) contained enough signals to establish that the statute waived the immunity protections of a public entity even though the waiver was not explicit:

> Had Section 37.053(d) gone on to state "immunity is waived[,"] its effect would be perfectly clear. But as we have observed, not all statutes are so explicit, and "[t]he rule requiring a waiver of governmental immunity to be clear and unambiguous cannot be applied so rigidly that the almost certain intent of the [legislature] is disregarded." We think Section 37.053(d) is clear enough. A general provision that electric utilities can condemn public land might be construed merely to recognize a power that cannot be exercised without a specific waiver of immunity, just as a statute authorizing a governmental entity to "be sued" does not waive immunity for all suits. But Section 37.053(d) is very specific: only electric corporations, only some land, and only with [the Public Utility Commission's] approval. A statute creating specific, restricted "rights[,"] as Section 37.053(d) does, cannot reasonably be read to tacitly condition their exercise on a separate waiver of immunity. The obvious purpose of Section 37.053(d)—indeed, its only apparent purpose—is to provide for

rights that can actually be exercised. "If a statute leaves no reasonable doubt of its purpose, we will not require perfect clarity, even in determining whether governmental immunity has been waived."

*Oncor*, 369 S.W.3d at 850 (footnotes omitted).

Our controversy focuses on whether the statute that Southlake relied on to condemn the Access Tract—Section 251.001 of the Local Government Code—may be read as a clear and unambiguous waiver of the rights of a public-entity condemnee. As with the statute in *Oncor*, the statute here does not contain the explicit statement that the immunity of a public-entity condemnee is waived. But we conclude that it sends the same type of signals identified in *Oncor* and effects a waiver.

Section 251.001 provides in relevant part,

(a) When the governing body of a municipality considers it necessary, the municipality may exercise the right of eminent domain for a public use to acquire public or private property, whether located inside or outside the municipality, for any of the following uses:

(1) the providing, enlarging, or improving of a municipally owned city hall; police station; jail or other law[-]enforcement detention facility; fire station; library; school or other educational facility; academy; auditorium; hospital; sanatorium; market house; slaughterhouse; warehouse; elevator; railroad terminal; airport; ferry; ferry landing; pier; wharf; dock or other shipping facility; loading or unloading facility; alley, street, or other roadway; park, playground, or other recreational facility; square; water works system, including reservoirs, other water supply sources, watersheds, and water storage, drainage, treatment, distribution, transmission, and emptying facilities; sewage system including sewage collection, drainage, treatment, disposal, and emptying facilities; electric or gas power system; cemetery; and crematory; [and]

. . . .

27

(5) any other municipal public use the governing body considers advisable.

Tex. Loc. Gov't Code Ann. § 251.001(a)(1), (5).

Applying the rationale of *Oncor*, we conclude that Section 251.001 is not so general that it cannot be seen as granting the power to condemn public property unless it is reinforced with an explicit waiver of immunity. *See* 369 S.W.3d at 850. As with Utilities Code Section 37.053(d), the language of Section 251.001 provides set criteria for when the power of eminent domain over public property may be exercised. The section provides what entity may exercise the power—a municipality. It provides what type of property over which the right may be exercised—"public or private property, whether located inside or outside the municipality." Finally, it provides the purposes for which the property may be condemned and describes them in detail. It is hardly an ambiguous passing reference to public land that requires the reinforcement of an additional, explicit signal that the immunity of a public-entity condemnee is waived. As was true of the statute in *Oncor*, we conclude that Section 251.001's apparent purpose "cannot reasonably be read to tacitly condition [its] exercise on a separate waiver of immunity. The obvious purpose of Section [251.001] is to provide for rights that can actually be exercised." *See id.*

Indeed, when the legislature requires the consent of the condemnee that is a governmental entity, it is explicit in imposing that requirement. For example, when a housing authority condemns property devoted to a public use, the legislature has

imposed the following requirement: "An authority may exercise the power of eminent domain to acquire property already devoted to public use, but the authority may not acquire real property belonging to a municipality, a county, another political subdivision, or the state without the consent of the governmental entity." *See* Tex. Loc. Gov't Code Ann. § 392.061(c).

And though it predates the discussion in *Oncor*, the Beaumont Court of Appeals' opinion in *State v. Montgomery County* concluded that a statutory provision, similar to Section 251.001, that permits counties to condemn public land was an unambiguous waiver of immunity. 262 S.W.3d 439, 442–43 (Tex. App.—Beaumont 2008, no pet.). In the Beaumont Court's words,

> In determining whether particular statutory language affirmatively and unambiguously waives sovereign immunity, the import of the statutory language must be ascertained in the context in which it occurs. *See Tooke v. City of Mexia*, 197 S.W.3d 325, 329 (Tex. 2006); Tex. Gov't Code Ann. § 311.034 . . . . The right of eminent domain granted to a county by the legislature "extends to public or private land, but not to land used for cemetery purposes." Tex. Loc. Gov't Code Ann. § 261.001(b) . . . . By extending the county's condemnation authority to public lands not used for cemetery purposes, the legislature clearly and unambiguously permits the counties to proceed against other governmental entities using that public land.

*Id.*

Further, Section 251.001 is unlike the statute that the Corpus Christi–Edinburg court recently examined and concluded, applying *Oncor*, that the statute did not contain a waiver of immunity. *See Hidalgo*, 627 S.W.3d at 539–40. The condemnee in *Hidalgo* argued that a statute providing that "[a] district or water supply corporation

29

may acquire by condemnation *any land*" was the type of general reference that *Oncor* found too vague. *Id.* (quoting Tex. Water Code Ann. § 49.222(a)). *Hidalgo* accepted the argument by noting, "We have no problem saying 'any land' means both private and public land; however, without more, [Section] 49.222(a) can be interpreted as merely a general grant of power to condemn public land that cannot be exercised without a specific waiver of immunity." *Id.* at 540. *Hidalgo* then noted that the statute that it examined had none of the restrictions found in the statute that *Oncor* had construed "that would render the statute meaningless if [the court] did not construe it as a waiver." *Id.* Thus, the statute that *Hidalgo* construed made sense "without finding a waiver," and its ambiguities had to be resolved in favor of retaining immunity. As we have explained, Section 251.001 contains sufficient signals to conclude that it waives the governmental immunity of a public-entity condemnee.

Relying on the foregoing analysis, we are not persuaded by Westlake's core argument that Section 251.001 has only generic language that *Oncor* indicated could not be read as a waiver of immunity. Westlake highlights *Oncor*'s hypothetical that "[a] general provision that electric utilities can condemn public land might be construed merely to recognize a power that cannot be exercised without a specific waiver of immunity, just as a statute authorizing a governmental entity to 'be sued' does not waive immunity for all suits." 369 S.W.3d at 850. As we have explained, the section goes beyond a generic reference to "public land" and provides a host of criteria that

30

must be met before the power may be exercised. *Oncor* based its holding on the specificity of the criteria in the statute it analyzed, and we do the same.

Westlake also argues that if Section 251.001 is read to waive a public entity's governmental immunity, a municipality can run amok by condemning property all over the state and even condemn the property of the State. This argument ignores how long the legislature has given municipalities the power to condemn public property without seeing a need to support that power with an explicit waiver of immunity. The argument also ignores the principles that are a check on such behavior and the checks that are found in the language of the section itself.

The statutory authority for a municipality to condemn public property is of long standing. In 1913, a provision implementing the home-rule amendment to the Texas Constitution provided "that the power of eminent domain hereby conferred shall include the right of the governing authority, when so expressed, to take the fee in the lands so condemned[,] and such power and authority shall include the right to condemn public property for such purposes." Act approved Apr. 7, 1913, 33rd Leg., R.S., ch. 147, § 4, 1913 Tex. Gen. Laws 307, 312. In 1925, the same language was added to the statutory provision governing the eminent-domain powers of cities with less than 5,000 inhabitants. Act approved Mar. 28, 1925, 39th Leg., R.S., ch. 137, § 1, 1925 Tex. Gen. Laws 344, 344–45 (repealed 1987). In 1945, an amendment that brought the eminent-domain powers of home-rule and general-law cities into line contained the same authorization to condemn public property that was first utilized in

1913.  Act of May 21, 1945, 49th Leg., R.S., ch. 243, § 1, 1945 Tex. Gen. Laws 379, 379–80 (repealed 1987).  These provisions were repealed with the passage of the Local Government Code, which specified the eminent-domain powers of municipalities in Section 251.001.  Act of May 1, 1987, 70th Leg., R.S., ch. 149, § 1, 1987 Tex. Gen. Laws 707, 1021–22 (current version at Tex. Loc. Gov't Code § 251.001).

And Texas courts, including our court, have long noted the statutory authority that the legislature has vested in municipalities to condemn public property.  Our court described the power as follows:

> Under the express provisions of Section 16 of Article 1175, . . . the City of Denton, as a Home[-]Rule City, has ["]exclusive dominion, control, and jurisdiction in, over[,] and under the public streets, avenues, alleys, highways[,] and boulevards["] within the City.  Under Section 18 of said Article, Denton has the power ["]to control, regulate, and remove all obstructions or other encroachments or encumbrances on any public street, alley[,] or ground. . . .["]  Section 15 of said Article [gave] Home[-]Rule Cities the power of eminent domain and the right to take the fee in lands so condemned, and such power and authority shall include the right to condemn [p]ublic property for such purposes.
>
> In *City of Tyler v. Smith County*, 151 Tex. 80, 246 S.W.2d 601 (. . . 1952)[,] that Court held that Tyler, a Home[-]Rule City, had the express authority to condemn public property for street purposes.  In that case[,] the Court held that the City could open a street through an area within the City [that] the county had previously dedicated as a public square.  It cites the above Section 15 of Article 1175[] and emphasizes that the City has the power and authority to condemn public property for that purpose.

*State v. City of Denton*, 542 S.W.2d 224, 226 (Tex. App.—Fort Worth 1976, writ ref'd n.r.e.); *see also Sierra Club v. Austin ISD*, 489 S.W.2d 325, 334 (Tex. App.—Austin 1972)

("The Legislature has expressly authorized home[-]rule cities to condemn both private property and public property."), *rev'd on other grounds*, 495 S.W.2d 878 (Tex. 1973). These cases do not hint that a municipality's eminent-domain power over public property is not sufficient to waive the condemnee's immunity.

There is a ready explanation regarding why it is not necessary to further complicate the statutory scheme by making a municipality search for an additional waiver of the condemnee's immunity before exercising the right that Section 251.001 provides. Texas law has long provided a mechanism that protects a public entity from the rapaciousness of another public entity's exercising its powers of eminent domain—the paramount-importance doctrine. The Texas Supreme Court described the contours of the doctrine as follows:

> We have long held that condemnees may prevent a condemnation when the property is already devoted to another public use and the condemnee establishes that the new condemnation "would practically destroy the use to which it has been devoted." *Sabine & E.T. Ry. Co. v. Gulf & I. Ry. Co. of Tex.*, 92 Tex. 162, 46 S.W. 784, 786 (1898). In *Sabine*[,] one railroad company sought to condemn a right-of-way across another railroad's yard so that it could connect to a third railroad's existing lines. *Id.* at 784. The question presented was whether the first railroad could exercise its eminent[-]domain power to condemn property already devoted to public use. *Id.* at 785. We held that if the condemnee can show that the condemnation would practically destroy the existing use, then to succeed with the condemnation[,] the condemnor must show that "the necessity be so great as to make the new enterprise of paramount importance to the public, and it cannot be practically accomplished in any other way." *Id.* at 786–87. Lower courts remain unsettled regarding what proof is necessary to satisfy the practical destruction standard and invoke the paramount[-]purpose test. *See Snellen v. Brazoria* [*Cnty.*], 224 S.W.2d 305, 311 (Tex. . . . App.—Galveston 1949, writ ref'd n.r.e.) (holding that condemning a portion of the center

33

of a boulevard in an unincorporated town for the purpose of constructing a fire station did not materially interfere with the existing use of the boulevard and thus did not trigger the paramount[-]importance requirement); *Cent. Power & Light Co. v. Willacy* [*Cnty.*], 14 S.W.2d 102, 103 (Tex. App.—San Antonio 1929, no writ) (holding that the paramount[-]importance requirement is triggered when "the proposed use will completely exclude the existing use"); *Tex. & N.O.R. Co. v. City of Beaumont*, 285 S.W. 944, 949 (Tex. . . . App.—Beaumont 1926, writ ref'd) (concluding that condemnation could proceed if the new use would not "seriously impair or interfere with" the existing use). We have indicated that the standard may be met when "the second use to which the property is sought to be put will destroy, or, at least, materially interfere with, that to which such property has been previously devoted." *F*[*ort*] *Worth & R.G. Ry. Co. v. Sw. Tel. & Tel. Co.*, 96 Tex. 160, 71 S.W. 270, 274–75 (1903) (reciting the standard before holding that the proposed use "may be applied consistently with the prior use," so application of the standard was unnecessary).

*Canyon Reg'l Water Auth. v. Guadalupe–Blanco River Auth.*, 258 S.W.3d 613, 616–17 (Tex. 2008). The doctrine of paramount importance presents not a jurisdictional issue but an issue to be litigated during the merits because the doctrine "does not implicate the power of one unit to bring the other to court; rather, the issue is resolved by the commissioners in the condemnation suit." *Montgomery Cnty.*, 262 S.W.3d at 445. Our interlocutory appellate jurisdiction is based on a dispute over the trial court's jurisdiction to hear the case, not on how the trial court ruled on the case's merits.

Here, Westlake invoked the doctrine of paramount importance in its motion to dismiss but then did not mention the doctrine again. We can only speculate that it did so because reliance on that doctrine undermines its claim that a parade of horribles would occur should Section 251.001 be read to contain a specific waiver of a public

condemnee's immunity and, perhaps, reinforces the perception that the trial court had jurisdiction to resolve the merits.

And another check is an argument that Westlake itself makes and that we will explore later in this opinion. Westlake argues that the power it is given to control streets and highways within its town limits—as found in Section 311.002 of the Transportation Code—trumps the power of condemnation that Southlake holds. Though we do not resolve the extent of that power due to the unique facts before us, this argument undermines Westlake's present argument—that the power to condemn public land in Section 251.001 is based on empty words and can only be exercised against a public entity after combing through the statute books to find an explicit waiver of immunity for that entity.

Further, we have already noted the internal checks within Section 251.001. Subsection (a)(1) of Section 251.001 exhaustively lists the purposes for which a municipality may condemn property. *See* Tex. Loc. Gov't Code Ann. § 251.001(a)(1). Again, these are the types of checks that *Oncor* relied on to conclude that the statute it analyzed clearly and unambiguously waived a public-entity condemnee's immunity. 369 S.W.3d at 850. Section 251.001 does also contain a general power that permits condemnation for "any other municipal public use the governing body considers advisable." *See* Tex. Loc. Gov't Code Ann. § 251.001(a)(5). The internal check in this subsection is the requirement of a municipal public use—a check that was further strengthened in 2011 when the legislature added the words "public use" instead of the

word "purpose" after the word "municipal" in subsection (a)(5). *See* Act of May 6, 2011, 82nd Leg., R.S., ch. 81, § 3, 2011 Tex. Gen. Laws 354, 357 (current version at Tex. Loc. Gov't Code § 251.001(a)(5)).

We have analyzed the language of Section 251.001 and the implications of Westlake's arguments to support its argument that the statute lacks a clear and unambiguous waiver of its governmental immunity. We conclude that the language and the other indicators that we have analyzed demonstrate that the statute is a clear and unambiguous waiver of a public-entity condemnee's governmental immunity. We overrule Westlake's first issue.

**C.      Why we conclude that Westlake has not conclusively proven an absence of subject-matter jurisdiction based on the claim that Southlake has no right of condemnation**

In its second issue, Westlake argues that "Southlake cannot plead a viable condemnation claim because Southlake cannot demonstrate that it has the legal ability to use the Westlake Property for a valid public use." Westlake makes two arguments in support of this issue. First, Westlake argues that the record establishes that Southlake had no viable public use for the taking because it was merely assisting a private development. Second, Westlake argues that the exclusive control that it possesses over its streets and highways—as provided in the Transportation Code— cannot be trumped by Southlake's power to condemn. The trial court apparently concluded that Westlake had failed to carry its burden on these issues or that resolution of these issues was premature. Either conclusion was not in error.

36

**1.** **We reject Westlake's argument that it conclusively established that Southlake had no public use for the taking of the Access Tract.**

We first address Westlake's second argument under its second issue. That argument is that "Southlake's condemnation claim is invalid because the taking claim was initiated simply to confer a private benefit, rather than for a public use," i.e., Southlake condemned the Access Tract only to gain access that the developer of the Residential Development could not obtain from Westlake. Again, Westlake raises an argument not raised in the trial court in its plea to the jurisdiction, which we read to raise only the argument that Westlake had the exclusive power to control streets and highways within its limits. And to support its present argument, Westlake relies on one statement made by Southlake's counsel during argument in the trial court. We have already noted that the trial court construed Westlake's plea to the jurisdiction as a motion for summary judgment. Westlake does not challenge the trial court's recharacterization of its pleading. Indeed, case law shows that a plea to the jurisdiction can mirror a traditional summary-judgment motion. *See Mission Consol. ISD v. Garcia*, 372 S.W.3d 629, 635 (Tex. 2012). Nor does Westlake explain why the trial court erred by denying the plea to the jurisdiction after it characterized the plea as a motion for summary judgment. Westlake does not even cite us to the appropriate standards that would guide the resolution of the question of whether Southlake is foreclosed from claiming that its taking had a public use. Thus, Westlake fails to point to evidence that if those standards were applied, it would conclusively negate

37

Southlake's claims that its taking was for a public use.  Westlake provides no basis for us to conclude that the trial court erred by denying its plea to the jurisdiction.

To address Westlake's argument, we must first impose a framework on it.  We will detail the burden of a condemnor to allege a public use and the necessity of a taking.  But the first question in our analysis is whether these elements of a condemnation implicate the trial court's jurisdiction.  The Beaumont Court of Appeals recently examined the disparate holdings from the Texas Supreme Court and the courts of appeals on this issue.  *See Graves v. Lone Star NGL Pipeline LP*, No. 09-18-00173-CV, 2019 WL 962544, at *4 (Tex. App.—Beaumont Feb. 28, 2019, no pet.) (mem. op.).  *Graves* noted that the Texas Supreme Court has held that one statutory element of condemnation (found in Property Code Section 21.012's requirement that a condemnation petition must state that the parties are unable to agree on the damages) is mandatory but not jurisdictional.  *Id.* at *3 (discussing *Hubenak v. San Jacinto Gas Transmission Co.*, 141 S.W.3d 172, 179 (Tex. 2004)).  On the other side of the ledger, *Graves* noted that the supreme court had conducted a jurisdictional analysis when examining the question of whether a university could establish the necessity of a taking.  *Id.* at *4 (discussing *FKM P'ship, Ltd. v. Bd. of Regents of Univ. of Hous. Sys.*, 255 S.W.3d 619 (Tex. 2008)).  Because the trial court had a procedural basis to deny Westlake's plea (i.e., whether Westlake met its summary-judgment burden), we do not reach the question of whether the public-use element is a jurisdictional question but merely assume that it is.

38

From a procedural standpoint, we again note that the trial court construed Westlake's plea to the jurisdiction as a motion for summary judgment. It is axiomatic that a plea to the jurisdiction can take two forms—one that relies solely on the pleadings and one that relies on evidence and a summary-judgment-like procedure. As we recently explained,

> When a plea to the jurisdiction challenges the pleadings, we determine if the pleader has alleged facts that affirmatively demonstrate the trial court's jurisdiction to hear the cause, construing the pleadings liberally in the plaintiff's favor and looking to the pleader's intent. [*City of Westworth Vill. v. City of White Settlement*, 558 S.W.3d 232, 239 (Tex. App.—Fort Worth 2018, pet. denied)] (citing *Miranda*, 133 S.W.3d at 226). If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiff should be afforded the opportunity to amend. *Id.* at 239–40.
>
> We also consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, as the trial court is required to do. *Miranda*, 133 S.W.3d at 227. *When the jurisdictional challenge implicates the merits of the plaintiff's cause of action and the plea to the jurisdiction includes evidence, the trial court reviews the relevant evidence to determine if a fact issue exists. Id.* If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the factfinder. *Id.* at 227–28. However, if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law. *Id.* at 228.

*Dragoo v. City of Fort Worth*, No. 02-20-00178-CV, 2021 WL 4472628, at *2 (Tex. App.—Fort Worth Sept. 30, 2021, no pet.) (mem. op.) (emphasis added); *see Mission Consol. ISD*, 372 S.W.3d at 635.

Below, Westlake supported its plea with fifty pages of evidence, including Southlake's resolution authorizing the filing of its condemnation suit against Westlake; a four-page, single-spaced affidavit from Westlake's assistant town manager detailing the chronology of events revolving around the Access Tract; its own resolution amending its right-of-way access management and connection ordinance; Southlake's Mobility Master Plan; an affidavit regarding the physical structure adjoining FM 1938; and emails communicating the State's position on whether it had jurisdiction to become involved in the dispute.

But Westlake's argument does not explain how this evidence conclusively proved the lack of a public use once the trial court construed Westlake's plea to the jurisdiction as a motion for summary judgment. Instead, we are given one paragraph that claims that Southlake admitted itself out of a condemnation claim with a statement acknowledging that it had no public use for the taking:

> Additionally, Southlake's ostensible public use for taking the [Access Tract] is invalidated by its judicial admission that these eminent[-]domain proceedings were initiated to "assist" in the development of a private residential neighborhood. According to Southlake, this condemnation suit was brought because "a decision was finally made to assist [the 13-Lot Development] by using Southlake's power of eminent domain to condemn [the Access Tract.]" *In other words, Southlake, rather than demonstrating that it intended to put the [Access Tract] to public use as required by Section 251.001, admitted that the property is to be taken for a private use. Southlake has effectively negated the "public use" element. Accordingly, Southlake cannot plead a viable condemnation against Westlake[,] and Westlake's immunity is not waived.* [Record citations omitted.] [Emphasis added.]

The record reference to support the argument was a statement Southlake's counsel made while arguing against Westlake's originally filed motion to dismiss.

Thus, Westlake is not arguing that Southlake's condemnation petition negates jurisdiction. Instead, Westlake is apparently arguing that one statement made by Southlake's counsel established as a matter of law that there was no public necessity for the taking. It does not appear that Westlake mentioned this alleged admission in its plea to the jurisdiction. And an argument relying on the statement does not answer the question that would have to be answered to enable us to reverse the trial court order after it construed Westlake's plea to the jurisdiction as a motion for summary judgment—how the evidence that Westlake used to support its plea to the jurisdiction negated Southlake's statements in its condemnation petition that it was taking the Access Tract for a public use.

If we were going to answer the question of whether Westlake conclusively negated Southlake's claim of a public use, we would need some guidance to resolve that question in light of the shifting burdens involved in answering it—guidance that Westlake fails to provide. Certainly, we agree that Southlake could not condemn the Access Tract without having a public use. The Texas Supreme Court recently outlined the constitutional public-use requirement and the corresponding statutory public-use requirement found in Section 251.001 of the Local Government Code as follows:

Under the Texas Constitution, property may be condemned only for a public use and only so long as the owner is justly compensated. Tex. Const. art. I, § 17 ("No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made . . . ."). The Local Government Code additionally requires that a taking be *necessary* for a public use: "When the governing body of a municipality considers it necessary, the municipality may exercise the right of eminent domain for a public use to acquire public or private property . . . ." Tex. Loc. Gov't Code [Ann.] § 251.001(a). In short, these provisions require the municipality to demonstrate[] [that] (1) it intends to put the property to public use (the public-use requirement)[,] and (2) the condemnation is necessary to advance or achieve that public use (the necessity requirement). *City of Austin v. Whittington*, 384 S.W.3d 766, 772 (Tex. 2012).

*KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 181 (Tex. 2019).

Though public use is undoubtedly a constitutional and a statutory requirement for Southlake's condemnation action, Westlake does not acknowledge the deference of our review and the shifting burdens that impact the public-use question. We summarize the law that we apply as follows:

- Though the ultimate question of whether a taking for a public use is a judicial one, "a legislative declaration on public use is entitled to our deference." *Id.* at 187.

- "[J]udicial review may nullify a taking where the condemnor's decision was fraudulent, in bad faith, or arbitrary and capricious." *Id.* These showings are affirmative defenses for which the condemnee bears the burden of proof. *Whittington*, 384 S.W.3d at 777–78.

- And as stated by the Texas Supreme Court,

42

Property is taken for public use only when "there results to the public some definite right or use in the business or undertaking to which the property is devoted." *See Coastal States Gas Producing Co. v. Pate*, 158 Tex. 171, 309 S.W.2d 828, 833 (1958). "It is immaterial if the use is limited to the citizens of a local neighborhood, or that the number of citizens likely to avail themselves of it is inconsiderable, so long as it is open to all who choose to avail themselves of it." *See Hous. Auth. of City of Dall*[.] *v. Higginbotham*, 135 Tex. 158, 143 S.W.2d 79, 83, 84 (1940). Similarly, the mere fact that a particular individual, group, or enterprise may benefit will not deprive the use of its public character. *See id.* This Court has, however, invalidated takings that conferred only a private benefit on a private party. *See Maher v. Lasater*, 163 Tex. 356, 354 S.W.2d 923 (1962); *Phillips v. Naumann*, 154 Tex. 153, 275 S.W.2d 464 (1955).

*KMS*, 593 S.W.3d at 186–87.

Thus, Westlake's single reference to Southlake's counsel's statement about assisting a developer makes no attack on whether Southlake made the appropriate legislative determination of public use and ignores that it was Westlake's burden to establish that the public-use determination was fraudulent, in bad faith, or arbitrary and capricious, if it makes that contention.[8] Nor does Westlake explain how

---

[8]Westlake's reply brief claims that Southlake is trying to manufacture a public use by claiming a public safety need for the Access Tract. The reply brief offers elaborate detail regarding why this concern is invalid because Southlake approved the Residential Development with only the limited access that the tract has without the Access Tract. The reply brief raises a fact-based argument that was not made to the trial court and relies on evidence that Westlake utilized to support its motion to dismiss and not its plea to the jurisdiction. Thus, the reply brief raises an argument for a later day. Though we doubt Westlake even raised the public-use argument that it is now making as grounds to support its plea to the jurisdiction, we have addressed the argument in its opening brief. We will not go further to review unraised arguments that are supported by evidence that was not utilized to support the matter that we review.

assistance to the developer negates any possibility of public use when all that is required for a public use is that "it is open to all who choose to avail themselves of it." *Id.* Ultimately, Westlake does not challenge the trial court's characterization of its plea to the jurisdiction as a motion for summary judgment, nor does it explain how the trial court, by utilizing the standards that guide the public-use determination, allegedly erred when it denied the plea. Thus, Westlake fails to persuade us that the trial court erred when it implicitly concluded that Westlake had failed to conclusively negate Southlake's assertion that its taking was for a public use.

> **2.  We reject Westlake's argument that it conclusively established that Southlake could never condemn the Access Tract because of Westlake's statutory power to control its streets.**

Westlake argues under the first subpart of its second issue that the balance of power in making decisions about its streets and highways unquestionably lies in its favor. Specifically, Westlake argues that Southlake's condemnation of the Access Tract contravenes Westlake's power under Section 311.002(a) of the Transportation Code, which provides that "[a] general-law municipality has exclusive control over the highways, streets, and alleys of the municipality." *See* Tex. Transp. Code Ann. § 311.002(a). Westlake argues that it is uncontroverted that Southlake's condemnation of the Access Tract impinges on Westlake's authority because Southlake's stated public use is to construct "roadway improvements." And Westlake claims that it has asserted the power given in Section 311.002 by enacting an Access

Management Ordinance that prohibits the very use of the Access Tract that Southlake contemplates. As a consequence, Westlake argues,

> Section 251.001 requires Southlake to demonstrate that it intends to put the [Access Tract] to public use. . . . However, the intended "public use" as demonstrated in the original petition is the construction of "roadway improvements" within another city's jurisdiction. That is a use that Southlake simply cannot achieve. Consequently, Southlake cannot demonstrate an intended "public use" as required by Section 251.001. Unable to meet the "public use" element, Southlake cannot plead a valid condemnation claim against Westlake, and Westlake's immunity is not waived. For these reasons, Southlake's condemnation claim should be dismissed for want of jurisdiction.

Though not cited by Westlake, there is authority to support its argument. These authorities deal with the power of counties to interfere with roads within a city's jurisdiction. For example, the Austin Court of Appeals dealt with a conflict between a home-rule city's control over its roadways and a county's authority to override that power when it attempted to construct an international bridge within the city. *See City of Laredo v. Webb Cnty.*, 220 S.W.3d 571, 574 (Tex. App.—Austin 2007, no pet.) (op. on reh'g). The conflict was resolved "in favor of the city 'in deference to the well-established precedent that, within the boundaries of a home-rule city, the municipality's roadway authority prevails over the county's.'" *Block House Mun. Util. Dist. v. City of Leander*, 291 S.W.3d 537, 545 (Tex. App.—Austin 2009, no pet.) (citing *City of Laredo*, 220 S.W.2d at 575–76). *City of Laredo* cited a number of older cases that hold that "[i]f . . . the County seeks to exercise this authority within the boundaries of a home-rule city without the City's consent, then—as courts have held for over a

45

century—the County's authority must yield to the City's." 220 S.W.3d at 578 (first citing *City of Breckenridge v. Stephens Cnty.*, 40 S.W.2d 43, 44 (Tex. 1931); then citing *Adams v. Rockwall Cnty.*, 280 S.W. 759, 760–61 (Tex. Comm'n App. 1926); then citing *State v. Jones*, 18 Tex. 874, 881 (1857); then citing *Hughes v. Cnty. Comm'rs Court of Harris Cnty.*, 35 S.W.2d 818, 821 (Tex. App.—Galveston 1931, no writ); and then citing *Benat v. Dall. Cnty.*, 266 S.W. 539, 541 (Tex. App.—Dallas 1924, writ ref'd)). And one of the cases cited by *City of Laredo* specifically addressed whether a county's attempt to condemn a roadway within a city's boundaries was void and held that

> where it affirmatively appears, as it does in this case, that petitioners (appellees) were not vested with the power of eminent domain[] and had no right under the law to have appellant's property, [which was] situated within the limits of the [C]ity of Dallas, condemned for street or highway purposes, no jurisdiction is conferred by filing a petition for condemnation, and all proceedings thereunder would be void.

*Benat*, 266 S.W. at 541–42.

But Southlake counters Westlake's claim of indisputable power by noting a wildcard at play in this case. The roadway to which Southlake seeks access is owned by the State of Texas and not Westlake, and Westlake owns only the right of way adjoining the road.[9] Southlake's argument is in essence that what the State giveth, the

---

[9]The following discussion of the respective ownership of the roadway of FM 1938 and its right of way occurred during the commissioners' hearing during the testimony of Westlake's assistant town manager:

Q. And in order to establish the nature of that roadway, is it a state highway, is it a local roadway? What -- how would you characterize that roadway?

State can take away, noting a holding that "[t]he [legislature's] acting for the state has primary and plenary power to control and regulate public roads and streets. It may delegate that power to municipal corporations, but such a grant of authority may be revoked or modified at any time." *See State v. City of Austin*, 331 S.W.2d 737, 741 (Tex.

A. It's an arterial.

Q. Who would you say owns the improvements that are on the road -- the improvement -- that improved roadway?

A. The Town of Westlake does own a portion of those improvements[,] and the State of Texas owns the remaining portion.

Q. I think I know, but please correct me. I want to investigate that. Does the Town of Westlake in your opinion own more than the retaining wall, fence, concrete rail, and the walkway within that roadway, public right-of-way?

A. Well, yes, the Town also owns the right-of-way.

Q. But improvements -- as far as improvements, Westlake does not own the roadway surface; is that correct?

A. Correct.

Q. It is a state highway in your assessment?

A. Correct.

Q. Yet you believe that the Town of Westlake should have complete sovereignty and control over who has access to that state highway?

A. Correct. Within the Town's jurisdiction, yes.

Q. How would another entity having access to a state highway infringe upon Westlake's sovereignty?

A. If it's forced upon them.

47

1960). Southlake also notes the Transportation Code's specific recognition of the State's ultimate authority in Section 203.003(c), which provides that "[t]he department's or the commission's exercise of a power under this chapter in a county or municipality removes the county's or municipality's exclusive jurisdiction over the specific public way affected by the exercise of power, to the extent the exercise of power affects the public way and its use." *See* Tex. Transp. Code Ann. § 203.003(c).

At this point, the parties' positions are ships passing in the night. And neither party tells us how we have, or how the trial court had, a sufficient record to decide which parties' position should prevail. All we know of the State's position in the matter is from an email chain with a three-year-old statement from a representative by the Texas Department of Transportation stating that the Department does not have "jurisdiction."

Again, the trial court viewed Westlake's plea to the jurisdiction as a "Motion Seeking Summary Judgment Denying Southlake's Right to Take." Case law supports the trial court's view. *See Mission Consol. ISD*, 372 S.W.3d at 635. Again, Westlake does not argue that the characterization was wrong or that it carried a summary-judgment burden to establish that in this confused situation and at this preliminary stage the trial court could have resolved the issue of control as a matter of law. And even if the trial court should not have recharacterized Westlake's pleading, the trial court was not mandated to answer the potentially complex question of the allocation of the power to control based on the thin record before it. The Texas Supreme Court

has recognized that "[a]n assertion of immunity may necessitate a more extensive investigation of the circumstances than a trial court can make in the initial stages of a condemnation proceeding." *Lazy W Dist. No. 1*, 493 S.W.3d at 544, n.44; *see also Bland ISD v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000) ("Whether a determination of subject-matter jurisdiction can be made in a preliminary hearing or should await a fuller development of the merits of the case must be left largely to the trial court's sound exercise of discretion."). The record, at this point, appears to lack the development that would allow the trial court to decide the complex legal questions placed in the context of what appear to be complex factual questions. This basis alone gave the trial court the discretion to deny Westlake's motion even if it was properly considered as a plea to the jurisdiction.

We overrule Westlake's second issue.

## V. Conclusion

Having denied Southlake's motion to dismiss this appeal and having overruled Westlake's two issues, we affirm the trial court's order "Denying and Redesignating Westlake's Plea to the Jurisdiction."

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: December 23, 2021

49